IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION


| | | |
|---|---|---|
| ERICA L. NEWTON, Special Administrator of the Unsupervised ESTATE OF ARIONA DARLING, Deceased, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | CASE NO.:  1:23-cv-00259 |
| DAVID J. GLADIEUX, in his official capacity as Sheriff of Allen County; DEPUTY CHIEF DAVID BUTLER, in his official capacity as Jail Commander of the Allen County Jail; BOARD OF COMMISSIONERS OF THE COUNTY OF ALLEN; OFFICER JENNIFER SIR LOUIS, in her individual capacity; OFFICER KELLY MOSS, in her individual capacity; NADINE HARRIS, M.S., Q.M.H.P., in her individual capacity; LAURA CLARK, in her individual capacity; and QUALITY CORRECTIONAL CARE, LLC, | ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |


**COMPLAINT FOR DAMAGES AND JURY TRIAL DEMAND**

Comes now the Plaintiff, Erica L. Newton,  Special Administrator of the Unsupervised Estate of Ariona Darling, deceased, and for her Complaint for Damages against the Defendants, David J. Gladieux, in his official capacity as Sheriff of Allen County, David Butler, in his official capacity as Jail Commander of the Allen County Jail, Board of Commissioners of the County of Allen, Officer Jennifer Sir Louis, in her individual capacity, Officer Kelly Moss, in her individual capacity, Nadine Harris M.S., Q.M.H.P., in her individual capacity, Laura Clark, in her individual capacity, and Quality Correctional Care, LLC, alleges and states as follows:

## JURISDICTION AND VENUE

1.     This is an action for money damages brought pursuant to 42 U.S.C. § 1983 for violations of the Fourteenth Amendment of the Constitution of the United States of America, as well as Indiana state law.

2.     Jurisdiction is founded upon 28 U.S.C. §§ 1331 and 1343, as well as 42 U.S.C. §§ 1983 and 1988. Plaintiff further invokes the supplemental jurisdiction of this Court under 28 U.S.C. § 1367 to hear and decide Plaintiff's claims arising under state law.

3.     Venue is proper in this district pursuant to 28 U.S.C. § 1391.

## PARTIES

4.     Ariona Darling (hereinafter "Ariona")  was 18 years old on June 27, 2021 when she committed suicide by hanging herself while on suicide watch at the Allen County Jail.  She was supposed to be monitored in a cell with a camera, but she was not. She was supposed to be checked on at least every 30 minutes, but she was not. As a result, despite her desperate calls for help in the days and hours leading up to her suicide, Defendants allowed Ariona to cover the window of her cell with paper, make preparations to hang herself with a bedsheet, and then sadly take her own life.

5.     Plaintiff, Erica L. Newton, is Ariona's mother. On August 18, 2021, by Order of the Allen County Superior Court under Cause Number 02D02-2108-EU-000484, Ms. Newton was appointed Special Administrator of the Unsupervised Estate of Ariona Darling, deceased, and in such capacity brings this cause of action against the Defendants for the wrongful death of Ariona.

6.     At all relevant times, Ariona was a citizen of the United States of America,  State of Indiana, Allen County, City of Fort Wayne. Ariona is survived by her mother, the Plaintiff herein, Erica L. Newton, and her father, Michael Newton.

7.      At all relevant times, the Defendant, David J. Gladieux (hereinafter "Sheriff Gladieux"), was the Sheriff of Allen County and was acting under color of law and in the course and scope of his employment with the Allen County Sheriff's Department. He is sued in his official capacity, only, to answer to Plaintiff's claims against the Allen County Sheriff's Department.

8.      At all relevant times, Sheriff Gladieux was the chief executive officer of the Allen County Sheriff's Department, and his duties included maintaining, staffing and operating the Allen County Jail located at 417 South Calhoun Street, in the City of Fort Wayne, Allen County, Indiana (hereinafter "the Jail).

9.      At all relevant times, Defendant, Deputy Chief David Butler (hereinafter "Jail Commander Butler"), was the Jail Commander of the Allen County Jail, and was acting under color of law in the course and scope of his employment with the Allen County Sheriff's Department. He is sued in his official capacity, only.

10.      At all relevant times, Defendants, Sheriff Gladieux and Jail Commander Butler, were responsible for taking care of the Jail and enforcing the rules and regulations of the Jail and for ensuring that its confinement officers were properly trained and obeyed the laws of the State of Indiana and the United States of America.

11.      At all relevant times, Defendant, Board of Commissioners of the County of Allen (hereinafter "Board of Commissioners"), was the executive for Allen County, Indiana, and was responsible for, among other things, preparing an annual budget for the county and maintaining all county property, including establishing and maintaining a county jail pursuant to Indiana Code §36-2-2-24. This includes not only providing a jail, but also keeping it in good repair. *Weatherholt v. Spencer County*, 639 N.E.2d 354, 356 (Ind. Ct. App. 1994).

12.    At all relevant times, Defendants, Officer Jennifer Sir Louis and Officer Kelly Moss (hereinafter collectively referred to at times as "Defendant Jail Officers"), were confinement officers at the Allen County Jail and were acting under color of law and within the course and scope of their authority and employment with the Allen County Sheriff's Department. They are sued in their individual capacities, only.

13.    At all relevant times, the Defendant, Nadine Harris M.S., Q.M.H.P., was a licensed mental health professional providing counseling and psychological services to patients in Indiana, including inmates with mental and behavioral health disorders at the Allen County Jail.

14.    At all relevant times, Defendant Harris was not a "qualified provider" as defined by Indiana Code § 34-18-2-24.5.

15.    At all relevant times, the Defendant, Laura Clark, was a medical and/or mental health professional providing counseling and psychological services to patients in Indiana, including inmates with mental and behavioral health disorders at the Allen County Jail.

16.    At all relevant times, Defendant Clark was not a "qualified provider" as defined by Indiana Code § 34-18-2-24.5.

17.    At all relevant times, Defendants, Nadine Harris M.S., Q.M.H.P., and Laura Clark (hereinafter collectively referred to at times as "Defendant QCC Personnel"), were acting under color of law and within the course and scope of their authority and employment with Defendant, Quality Correctional Care, LLC. They are sued in their individual capacities, only.

18.    At all relevant times, Defendant, Quality Correctional Care, LLC ("hereinafter "QCC"), was a domestic limited liability company providing medical and psychological services to patients in Indiana, including inmates with medical, mental, and behavioral health disorders at the Allen County Jail.

4

19.     At all relevant times, Defendant QCC was not a "qualified provider" as defined by Indiana Code § 34-18-2-24.5.

20.     At all relevant times, Defendant QCC had been contracted to provide medical, mental, and behavioral health services to inmates at the Allen County Jail.

## BACKGROUND FACTS

21.     On May 13, 2021, Ariona was arrested and booked into the Allen County Jail.

22.     On June 3, 2021, Ariona submitted a Medical Request Form asking to see a "psych doctor."

23.     On June 4, 2021, Ariona saw Jordan Gregory, RN, and reported experiencing anxiety, depression, and "seeing tracers."

24.     On June 12, 2021, Ariona reported that she was suicidal. At that time she was placed on Level 1 suicide watch by QCC personnel.

25.     QCC Level 1 suicide watch is for those inmates who engage in self-injurious behavior or threaten suicide with a specific plan.

26.     QCC Level 1 suicide watch precautions require that the inmate be held in a camera cell, wear a suicide smock, be provided with a suicide blanket instead of regular bedding, and be visually observed in person no greater than every 15 minutes.

27.     On June 13, 2021, QCC Nurse Jeanie Herman, LPN, evaluated Ariona at which time she no longer reported desires of committing self-harm. Nurse Herman shared her evaluation with QCC mental health provider Nadine Harris, MS QMHP (hereinafter "Harris"), who then changed Ariona's status to the less restrictive QCC Level 2 suicide watch.

28.     Per Harris' recommendations on a Suicide Watch Protocol form, Ariona was still to be held in a camera cell and checked on every 15 minutes, but she was allowed normal clothes and regular bedding.

29.     Jail staff signed Harris' Suicide Watch Protocol form acknowledging receipt, but they did not follow Nurse Harris' recommendations. Specifically, Jail staff only checked on Ariona every 30 minutes, with some intervals much longer.

30.     On June 14, 2021, QCC Nurse Jordan Gregory, RN, interviewed Ariona at which time she denied any desire of committing self-harm. Nurse Gregory then discontinued Ariona's suicide watch.

31.     On June 17, 2021, Ariona filled out a Medical Request Form stating, "I NEED TO SPEAK WITH THE PSYCH DOCTOR! PLEASE…" The form was signed by a confinement officer acknowledging receipt on June 18, 2021 at 7:27 AM.

32.     On June 18, 2021, Ariona told confinement officer Chelse Richwine that she was feeling suicidal. Ariona was deemed acutely suicidal and placed back on QCC Level 1 suicide watch where she was under observation checks every fifteen (15) minutes. Ariona was then moved to cell Z-3517.

33.     From June 18, 2021 through June 21, 2021 Ariona remained on QCC Level 1 suicide watch.

34.     On June 20, 2021 Ariona told QCC Nurse Melanie Ferrer, LPN, that she was still suicidal with concerns related to her pending serious criminal charges. Ariona told Nurse Ferrer that, "she has several charges and did nothing wrong." Ariona also reported that her current meds were not working and that she was hearing voices in her head. Although she denied any current suicide plan, Ariona told Nurse Ferrer, "she just does not want to live."

6

35.     On June 21, 2021, Ariona was interviewed by QCC mental health professional Jordan Gregory, RN, at 9:25 AM. During the interview, Ariona was laying on her bunk covered with a suicide blanket. Nurse Gregory described her mood as "withdrawn, angry and irritable," and her attitude as "uncooperative."

36.     At that time Ariona reported to Nurse Gregory that she was worried about her pending criminal case. Ariona reported "having a big decision to make and struggling to cope." Specifically, Ariona told Nurse Gregory that that she had to decide between "getting the max sentence" or testifying against her boyfriend which "could put her at risk." She reported "wanting to harm herself if she had items available."

37.     At the conclusion of his interview with Ariona on June 21, 2021, Nurse Gregory kept Ariona on QCC Level 1 suicide watch. The Suicide Watch Protocol form on that dated specifically notes "Strangulation concern."

38.     On June 22, 2021, 2022, QCC Nurse Gregory again evaluated Ariona. At that time Ariona still expressed "fleeting" suicide ideation, but denied active thoughts on wanting to harm herself. Ariona also reported feeling like "she can't control her emotions", that she became "easily irritable", and was "freaking out." Ariona also reported that the Zoloft she was taking "isn't helping anything."

39.     At that time Nurse Gregory filled out a Suicide Watch Protocol form changing Ariona's status to the less restrictive QCC Level 2 suicide watch. Ariona was allowed regular clothing and bedding, but she was supposed to be housed in a holding cell with a camera. Observation checks were extended to thirty (30) minute intervals.

40.    Jail staff signed Nurse Gregory's Suicide Watch Protocol form acknowledging receipt, but they did not follow Nurse Gregory's recommendations. Specifically, Jail staff placed Ariona back into cell Z-3517 which was <u>not</u> a holding cell with a camera.

41.    On June 23, 2021, QCC Nurse Gregory completed another Suicide Watch Protocol form keeping Ariona on a QCC Level 2 suicide watch with the same precautions.

42.    Jail staff signed Nurse Gregory's Suicide Watch Protocol form acknowledging receipt, but again they did not follow Nurse Gregory's recommendations. Specifically, Jail staff kept Ariona in cell Z-3517 which was not a holding cell with a camera.

43.    On June 24, 2021, 2022, QCC Nurse Gregory completed another Suicide Watch Protocol form keeping Ariona on a QCC Level 2 suicide watch with the same precautions.

44.    Jail staff signed Nurse Gregory's Suicide Watch Protocol form acknowledging receipt, but again they did not follow Nurse Gregory's recommendations. Specifically, Jail staff kept Ariona in cell Z-3517 which was not a holding cell with a camera.

45.    On June 25, 2021, QCC Nurse Gregory completed another Suicide Watch Protocol form keeping Ariona on a QCC Level 2 suicide watch with the same precautions.

46.    Jail staff signed Nurse Gregory's Suicide Watch Protocol form acknowledging receipt, but again they did not follow Nurse Gregory's recommendations. Specifically, Jail staff kept Ariona in cell Z-3517 which was not a holding cell with a camera.

47.    On June 26, 2021, Defendant, Laura Clark, evaluated Ariona at 1:21 PM. At that time Clark noted that Ariona's affect was "blunted" and her appearance "disheveled." Ariona reported that she was sleeping poorly and felt depressed.

48.    During the evaluation on June 26, 2021, Clark noted that Ariona was suicidal and that her suicide thoughts were related to her criminal case. Clark asked Ariona whether she had a current plan to commit suicide. Clark then recorded Ariona's response as follows:

> [s]he has no plan, she says this with a smile and looks down [and says] "not now anyway."

49.    During the evaluation on June 26, 2021, Ariona asked for a mood stabilizer and anti-anxiety medication, repeating her concern that "the Zoloft was not working." Ariona also requested yet again to see a doctor. Clark stated that she would put Ariona on the doctor visit list.

50.    Defendant Clark failed to recommend that Ariona be placed on a QCC Level 1 suicide watch even though it was obvious that Ariona was threatening to harm herself.

51.    Defendant Clark shared her evaluation with a QCC mental health provider, Defendant, Nadine Harris, MS QMHP.

52.    Even though it was obvious that Ariona was threatening to harm herself, Harris filled out a Suicide Watch Protocol form keeping Ariona on a Level 2 suicide watch.

53.    Per the Suicide Watch Protocol form completed on June 26, 2021 at 2:07 PM, Harris increased the frequency of checks on Ariona to every 15 minutes.  Ariona was still to be held in a holding cell with a camera.

54.    Defendant Harris then failed to provide the new Suicide Watch Protocol form to Jail staff who never signed the form acknowledging receipt.

55.    Jail staff failed to house Ariona in a holding cell with a camera the last 24 hours of her life. Instead, she was kept in cell Z-3517 which does not have a camera in the cell.

56.    Jail staff had Ariona on a 30 minute watch the last 24 hours of her life, contrary to Harris' Suicide Watch Protocol form.

57.     The following morning on June 27, 2021, Ariona's observation form indicates that observations were still occurring at thirty (30) minute intervals.

58.     During the afternoon hours of June 27, 2021, the Defendants, Officer Jennifer Sir Louis and Officer Kelly Moss, were working at the Allen County Jail in the Z block where Ariona was housed. They were responsible for conducting Ariona's observation checks.

59.     During the afternoon hours of June 27, 2021, while in cell Z-3517, Ariona could be heard kicking at her cell door, screaming and crying.

60.     Inmates near Ariona's cell reported that Ariona had been communicating with her boyfriend who was housed on the floor directly below Ariona's cell by speaking through the toilet. Ariona's boyfriend was threatening Ariona if she testified against him, taunting her and urging Ariona to take her own life which would benefit him as a co-defendant facing serious criminal charges.

61.     The Defendant Confinement Officers were aware of the communications between Ariona and her boyfriend, but did nothing to prevent them from occurring.

62.     On the afternoon of June 27, 2021, Ariona's lunch tray was collected from her cell at 12:16 PM. by Defendant Sir Louis.

63.      Shortly after Defendant Sir Louis picked up Ariona's lunch tray, Ariona covered her cell window with paper to obscure her actions.

64.     Thereafter, Ariona began making preparations to hang herself, including ripping her bedsheet, making a noose, tying the sheet to her upper bunk, and then placing it over her head.

65.     Had the Defendant QCC Personnel placed Ariona on a Level 1 suicide watch after Clark's June 26, 2021 evaluation, Ariona would have, more likely than not, been prevented from harming herself.

10

66.     Had the Defendant QCC Personnel made the Jail staff aware of the need to observe Ariona every 15 minutes after Defendant Clark's June 26, 2021 evaluation, Ariona would have, more likely than not, been prevented from harming herself.

67.     Had Ariona been housed in a cell with a camera as recommended by the QCC since June 20, 2021, Ariona's actions in preparing to harm herself would have, more likely than not, been discovered and prevented.

68.     Even though Ariona was supposed to be observed every 15 minutes per Defendant Harris' Suicide Watch Protocol form, the Defendant Confinement Officers did not check on Ariona from 12:16 PM to 1:38 PM.[1]

69.     Even though Ariona had placed a paper over the window to her cell—an obvious warning sign that she was attempting to harm herself—the Defendant Confinement Officers did not check on Ariona from 12:16 PM to 1:38 PM

70.     At 1:38 PM on June 27, 2021, Defendants Sir Louis and Moss entered cell Z-3517 and found Ariona hanging by a bed sheet tied to the bunkbed.

71.     Ariona was unable to be revived and was pronounced dead from asphyxia due to hanging shortly after being taken to the hospital on June 27, 2021.


### CLAIMS AGAINST THE DEFENDANT JAIL OFFICERS PURSUANT TO 42 U.S.C. § 1983

72.     Plaintiff incorporates paragraphs 1 through 71 as if fully set forth herein.

73.     During Ariona's detention at the Allen County Jail, the Defendant Jail Officers identified herein were deliberately indifferent to the serious risk of her committing suicide.

---

[1] Defendant Sir Louis documented a check on Ariona's Observation Order form at 12:51 PM, but video surveillance of the area outside Arion's cell confirms this check did not occur.

74.    The failure of the Defendant Jail Officers to adequately monitor Ariona for suicide demonstrate a total lack of regard for her right to be free from unnecessary and unlawful bodily harm and her right to reasonable medical and/or psychological care for her health, well-being and personal safety.

75.    The Defendant Jail Officers' conduct wholly lacks the due care and diligence which prudent and reasonable Confinement Officers would have displayed under similar circumstances.

76.    The acts and omissions of the Defendant Jail Officers as described herein were done willfully, wantonly, and maliciously, and with such reckless disregard of the consequences as to reveal a conscious and deliberate indifference to Ariona's serious medical and/or psychological conditions which resulted in her untimely death.

77.    The Defendant Jail Officers are responsible for Ariona's death as a result of their intentional, willful, wanton, and/or reckless acts and omissions, including but not limited to: (1) failing to monitor, protect and provide for Ariona's safety while she was detained; (2) failing to adequately monitor Ariona for suicide even though she displayed obvious risk factors; (3) failing to follow the suicide precautions outlined by QCC personnel; (4) failing to prevent Ariona's boyfriend (and co-defendant) from communicating with her; and (5) failing to perform regular checks on Ariona, even though they knew she was at risk to harm herself.

78.    As a direct and proximate result of the wrongful acts and omissions of the Defendant Jail Officers, Ariona died, and therefore, the Plaintiff seeks to recover compensatory damages for the wrongful death of Ariona, including her last medical, funeral, and burial expenses; expenses incurred in the administration of the her estate; reasonable attorney fees and costs

pursuing this action; punitive damages to punish the Defendant Confinement Officers for violating

Ariona's 14th Amendment rights;  and any and all other damages allowed by state and federal law.

## CLAIMS AGAINST THE DEFENDANT QCC PERSONNEL PURSUANT TO 42 U.S.C. § 1983

79.     Plaintiff incorporates paragraphs 1 through 78 as if fully set forth herein.

80.     During Ariona's detention at the Allen County Jail, the Defendant QCC Personnel identified herein were deliberately indifferent to the serious risk of her committing suicide.

81.     The failure of the Defendant QCC Personnel to fully evaluate Ariona, recommend adequate suicide precautions, and then communicate those precautions to Jail staff, demonstrate a total lack of regard for her right to be free from unnecessary and unlawful bodily harm and her right to reasonable medical and/or psychological care for her health, well-being and personal safety.

82.      The conduct of the Defendant QCC Personnel wholly lacks the due care and diligence which prudent and reasonable medical personnel would have displayed under similar circumstances.

83.     The acts and omissions of the Defendant QCC Personnel as described herein were done willfully, wantonly, and maliciously, and with such reckless disregard of the consequences as to reveal a conscious and deliberate indifference to Ariona's serious medical and/or psychological conditions which resulted in her untimely death.

84.      The Defendant QCC Personnel are responsible for Ariona's death as a result of their intentional, willful, wanton, and/or reckless acts and omissions, including but not limited to: (1) failing to fully evaluate Ariona, recommend adequate suicide precautions, and then

communicate those precautions to Jail staff so as to protect and provide for Ariona's safety while she was detained; (2) failing to ensure Ariona was adequately monitored for suicide even though it was patently obvious that she was at risk to harm herself; (3) failing to place Ariona on QCC Level 1 suicide watch on June 26, 2021 even though it was patently obvious that she was at risk to harm herself; (4) failing to communicate their recommendations regarding the need to monitor Ariona every 15 minutes to Jail staff on June 26, 2021; and (5) failing to timely schedule Ariona for an appointment with a physician to adjust her medications.

85.    As a direct and proximate result of the wrongful acts and omissions of the Defendant QCC Personnel, Ariona died, and therefore, the Plaintiff seeks to recover compensatory damages for the wrongful death of Ariona, including her last medical, funeral, and burial expenses; expenses incurred in the administration of the her estate; reasonable attorney fees and costs pursuing this action; punitive damages to punish the Defendant QCC Personnel for violating Ariona's 14th Amendment rights;  and any and all other damages allowed by state and federal law.

**CLAIMS AGAINST DEFENDANTS GLADIEUX, BUTLER
AND THE BOARD OF COMMISSIONERS OF ALLEN CONTY
PURSUANT TO 42 U.S.C. § 1983**

86.    Plaintiff incorporates paragraphs 1 through 85 as if fully set forth herein.

87.    The Allen County Jail was built in 1981, although it was added onto in 1994, 1998 and 2004.

88.    The Allen County Jail has long been overcrowded, understaffed and without sufficient space.

89.    The Jail has exceeded its 732 total bed capacity since at least 2016.

90.     This is even more troubling given that the Jail is considered operationally full at 80-85 percent of its total capacity to allow for the proper classification of inmates based on security restrictions, medical needs, and other factors, such as safely housing those at risk for suicide, like Ariona.

91.     Classification is essential to protect the safety of both detainees and staff. For example, detainees with mental and physical disabilities should be separated from those without disabilities; detainees who are prone to be preyed upon should be separated from predators; detainees at risk of suffering from drug and alcohol withdrawal should be separated and closely monitored; and detainees, like Ariona, who are at risk of harming themselves should be separated and closely monitored.

92.     As a result of the poor conditions at the Jail, on January 21, 2020, a class action lawsuit was filed in federal court against Sheriff Gladieux and the Allen County Commissioners alleging that the Jail's conditions violate the 8th and 14th Amendments to the U.S. Constitution. See *Vincent Morris v. Sheriff of Allen County, et al,* U.S.D.C., N.D. Ind., Case 1:20-CV-34 DRL. Among other allegations, the lawsuit alleged that "[i]f prisoners are in medical or other forms of distress, it is difficult, if not impossible, to get prompt attention from guards…there have been at least 4 suicides since 2011."

93.     On March 31, 2022, the Court entered summary judgment for the Class and against Sheriff Gladieux and the Board of Commissioners in the *Morris* case. In doing so, the Court made certain factual findings, including the following:

> a.  Given that the Jail is regularly over capacity, the Jail Commander believes that the current capacity of the Jail should be over 1,000.

b.   There is a lack of sufficient staffing at the Jail and the lack of adequate staffing causes numerous problems including "daily deficiencies in controlling inmate behavior" and "daily deficiencies in observing prisoners."

c.   With the exception of cells in five blocks added in 2004 (6A, 6B, 6C, 6D and 6F), the cells do not have call buttons.

d.   There are very few cells at the Jail which have in-cell cameras. There are three receiving cells that are sometimes used to house severely mentally ill inmates, and these cells contain cameras. There are also "a few cells in some of the blocks" that have cameras in them which can be used to monitor suicidal detainees.

e.   Without an officer supervising the block, incidents occur of which the staff is not immediately aware, and when there are urgent situations or emergencies, prisoners in most of the blocks must resort to kicking or banging on their doors or yelling to attract someone's attention, as most blocks do not have a call button or intercom system.

f.   Frequently there are delayed responses by staff at the Jail when prisoners are suffering serious medical or mental health events.

g.   The physical structure of the Jail, combined with the staffing deficiencies in the Jail, leads directly to the inability of staff to respond to, or even know about, emergency situations in the cell blocks.

      h.   The Sheriff and Board of Commissioners are well aware of the

conditions and problems in the Allen County Jail.

94.     At the time Ariona hung herself, she was in Cell Z-3517. This cell block was built

in 1998 and does not have any in-cell call buttons.

95.     Cell Z-3517 did not have an in-cell camera, either.

96.     Due to the limited facilities at the Jail, there are an inadequate number of cells with

video surveillance equipment to monitor detainees at risk for suicide, like Ariona.

97.     Due to the limited facilities at the Jail, there are an inadequate number of cells with

in-cell call buttons which allow detainees to gain the attention of Jail staff in an emergency.

98.     Ariona was going through a mental health crisis in the afternoon of June 27, 2021.

She was kicking at her cell door, screaming and crying.

99.     With no in-cell camera or call button, Ariona had no way to communicate with Jail

staff that she needed help.

100.    No Jail staff responded to Ariona's pleas for help on the afternoon of June 27, 2021.

101.    Other detainees housed in Z Block told investigators after Ariona's death that they

heard her kicking at her cell door, screaming and crying.

102.    With no in-cell call buttons, the other detainees housed in nearby cells had no way

to summon Jail staff to come and help her.

103.    In order to safely monitor detainees at risk for suicide, there needs to be sufficient

Jail staff to conduct observation checks in accordance with the recommendations from the QCC

mental health personnel.

104.    During Ariona's detention at the Jail, there was insufficient Jail staff to properly

monitor her.

105.    With no in-cell call buttons, no in cell-cameras, and given the insufficient number of Jail staff, it was impossible for other detainees and inmates at the Jail to get the attention of Jail staff to warn them that Ariona needed help.

106.    Due to the insufficient number of Jail staff and lack of cells with a camera, Ariona was not monitored for suicide as recommended by QCC mental health personnel.

107.    In the 22 months before Ariona took her own life, three other individuals at the Jail committed suicide.

108.    Defendants Gladieux, Butler and the Board of Commissioners have been on notice for some time concerning the deficiencies in the Jail, but have failed to take the necessary steps to resolve the overcrowding and other problems. At all times they have acted in a deliberate and purposeful manner and a reasonable person would objectively perceive their behavior as deliberately indifferent to these serious deficiencies which put suicidal detainees like Ariona at risk.

109.    By failing to provide Ariona with constitutionally adequate care and supervision, Defendants Gladieux, Butler and the Board of Commissioners knowingly disregarded an excessive risk to her health and safety and knowingly subjected her to pain, physical and mental injury, and death, thereby violating Ariona's rights under the Fourteenth Amendment to the United States Constitution.

110.    Defendants Gladieux and Butler also had a duty to train and supervise their Jail officers, doctors, nurses and staff regarding how to monitor and provide a safe environment for potentially suicidal inmates such as Ariona.

111.    Defendants Gladieux and Butler were deliberately indifferent to the obvious need for supervision and training of the officers, doctors, nurses and staff regarding proper detainment procedures for potentially suicidal inmates, including Ariona.

112.    As a direct and proximate result of the aforementioned conduct of the Defendants, Ariona was deprived of the rights, privileges and immunities secured to her under the Constitution and laws of the United States of America, including her rights under the Fourteenth Amendments to the United States Constitution.

113.    As a direct and proximate result of the wrongful acts and omissions of Defendants as described above, Ariona died, and therefore, the Plaintiff seeks to recover damages for the wrongful death of Ariona, including her last medical, funeral, and burial expenses, expenses incurred in the administration of the her estate, reasonable attorney fees and costs pursuing this action, and any and all other damages allowed by state and federal law.

## NEGLIGENCE CLAIMS AGAINST ALL DEFENDANTS PURSUANT TO INDIANA STATE LAW

114.    Plaintiff incorporates paragraphs 113 as if fully set forth herein.

115.    In accordance with Indiana statute, Defendants were timely served with a Notice of Tort Claim on December 21, 2021 by certified mail.

116.    Pursuant to Indiana statute, the Plaintiff's tort claim has been constructively denied as Defendants have had more than ninety (90) days to investigate the claim but have failed to respond in any manner.

117.    The Defendants and/or their agents and/or employees, acting within the course and scope of their employment, are responsible for Ariona's death as the result of their negligent acts

and/or omissions, including, but not limited to: (1) failing to provide adequate medical and mental health care and treatment to Ariona when they knew or should have known that she was a suicide risk; (2) failing to monitor, protect and provide for Ariona's safety while she was incarcerated; (3) failing to appropriately communicate with each other concerning Ariona's risk to herself due to her psychological history, recent comments, and poor mental health; (4) failing to provide adequate emergency medical treatment; (5) failing to timely contact emergency services to transport Ariona to the hospital; and (6) failing to comply with the appropriate standards of medical and psychological care.

118.    Defendants Gladieux and Butler also negligently hired, supervised, and retained the Defendant Jail Officers and Defendant QCC Personnel when they knew, or should have known, that said personnel were not properly trained and were otherwise unfit for service.

119.    Defendants Gladieux and Butler negligently failed to train and supervise their officers, doctors, nurses, and staff with regards to monitoring inmates at risk for suicide.

120.    As a direct and proximate result of the wrongful acts and omissions of Defendants and/or their agents and/or employees, Ariona died, and therefore, the Plaintiff seeks to recover damages for the wrongful death of Ariona, including her last medical, funeral, and burial expenses, expenses incurred in the administration of the her estate, reasonable attorney fees and costs pursuing this action, and any and all other damages allowed by state and federal law.

WHEREFORE, the Plaintiff, Erica L. Newton, Individually and as Special Administrator of the Estate of Ariona Darling, deceased, requests the following relief:

a.    An award of compensatory damages based on Plaintiff's 42 U.S.C. § 1983 claims for the violation of Ariona Darling's constitutional rights;

b.       An award of punitive damages against the Defendant Jail Officers and the Defendant QCC Personnel based on Plaintiff's 42 U.S.C. § 1983 claims to punish Defendants for their callous and/or reckless indifference to Ariona Darling's constitutional rights;

c.       An award of compensatory damages for the wrongful death of Ariona Darling, including, but not limited to, all damages allowed by the Indiana Wrongful Death Act;

d.       An award of attorney fees and costs pursing this matter pursuant to 42 U.S.C. § 1988 and prevailing Indiana state law;

e.       Trial by jury; and

f.       All other relief just and proper in the premises.

Respectfully submitted,

**WAGNER REESE, LLP**


*/s/ Stephen M. Wagner*
Stephen M. Wagner, Atty. No. 18248-49
WAGNER REESE, LLP
11939 North Meridian Street
Carmel, IN  46032
Telephone: (317) 569-0000
Fax: (317) 569-8088
Email: swagner@wagnerreese.com